UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

**STACIE DONNICK,**

    **Plaintiff,**

    v.                                                                     Case No. 18-CV-1359

**NANCY A. BERRYHILL,**
**Acting Commissioner of Social Security,**

    **Defendant.**

---

## DECISION AND ORDER

---

Stacie Donnick seeks judicial review of the final decision of the Commissioner of the Social Security Administration denying her claim for a period of disability and disability insurance benefits and for supplemental security income under the Social Security Act, 42 U.S.C. § 405(g). For the reasons below, the Commissioner's decision will be reversed and the case remanded for further proceedings consistent with this decision pursuant to 42 U.S.C. § 405(g), sentence four.

### BACKGROUND

Donnick filed an application for a period of disability and disability insurance benefits on September 17, 2014. (Tr. 13.) She filed a Title XVI application for supplemental security income on August 21, 2014. (*Id.*) Donnick alleges disability beginning on July 23, 2013 due to multiple physical and mental conditions, the relevant ones here being chronic obstructive pulmonary disease ("COPD") and breathing issues. (Tr. 310.) Donnick's applications were denied initially and upon reconsideration. (Tr. 13.) Donnick filed a request for a hearing and

a hearing was held before an Administrative Law Judge on June 29, 2017. (*Id.*) Donnick testified at the hearing, as did Susan A. Entenberg, a vocational expert.

In a written decision issued September 22, 2017, the ALJ found that Donnick had the following severe impairments: fibromyalgia, emphysema, degenerative disc and joint disease, gastroerosive disease, and affective, anxiety, and personality disorders. (Tr. 16.) The ALJ further found that Donnick did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1 (the "listings"). (Tr. 17–18.) The ALJ found Donnick had the residual functional capacity ("RFC") to perform sedentary work, with the following limitations: frequently, but not constantly, reach overhead and in other directions; handle and feel objects frequently, but not constantly; occasionally balance, stoop, kneel, crouch, crawl, and climb ramps, stairs, ladders, ropes, and scaffolds; occasionally work around unprotected heights or moving machinery; limited to simple, routine, repetitive tasks which would not involve work at a production rate pace; limited to simple work related decisions; occasionally respond appropriately to co-workers and the general public; requires a cane for ambulation; and would likely be off-task, but not more than ten percent of the time in any eight-hour workday. (Tr. 18.)

While the ALJ found that Donnick was unable to perform any past relevant work, he also found that given Donnick's age, education, work experience, and RFC, other jobs that she could perform existed in significant numbers in the national economy. (Tr. 21–22.) As such, the ALJ found that Donnick was not disabled from her alleged onset date until the date of the decision. (Tr. 22.) The ALJ's decision became the Commissioner's final decision when the Appeals Council denied the plaintiff's request for review. (Tr. 1–5.)

**DISCUSSION**

*1.    Applicable Legal Standards*

The Commissioner's final decision will be upheld if the ALJ applied the correct legal standards and supported his decision with substantial evidence. 42 U.S.C. § 405(g); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). Substantial evidence is not conclusive evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010) (internal quotation and citation omitted). Although a decision denying benefits need not discuss every piece of evidence, remand is appropriate when an ALJ fails to provide adequate support for the conclusions drawn. *Jelinek*, 662 F.3d at 811. The ALJ must provide a "logical bridge" between the evidence and conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ is also expected to follow the SSA's rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). In reviewing the entire record, the court does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Finally, judicial review is limited to the rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

*2.    Application to this Case*

Donnick raises a single claim of error in the ALJ's decision: the ALJ improperly weighed the opinion of Donnick's treating pulmonologist, Dr. Stephen Wilson. An ALJ must consider all medical opinions in the record, but the method of evaluation varies depending on

3

the source. Generally, more weight is given to the medical opinions of treating sources. 20 C.F.R. § 404.1527(c)(2).[1] If the opinion of a treating source is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record, the opinion is given "controlling weight." *Id.* Even if the ALJ finds that the opinion is not entitled to controlling weight, he may not simply reject it. Social Security Ruling ("SSR") 96-2p. Rather, if the ALJ finds that a treating source opinion does not meet the standard for controlling weight, he must evaluate the opinion's weight by considering a variety of factors, including the length, nature and extent of the claimant and physician's treatment relationship; the degree to which the opinion is supported by the evidence; the opinion's consistency with the record as a whole; and whether the doctor is a specialist. 20 C.F.R. § 404.1527(c).

The ALJ must always give good reasons for the weight given to a treating physician's opinion. 20 C.F.R. § 404.1527(c)(2); SSR 96-2p. The ALJ must give reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p. An ALJ can reject a treating physician's opinion only for reasons supported by substantial evidence in the record. *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003).

---

[1] On January 18, 2017, the SSA published the final rules entitled "Revisions to Rules Regarding the Evaluation of Medical Evidence" in the Federal Register (82 FR 5844). The final rules became effective on March 27, 2017. For claims filed before March 27, 2017, however, the SSA continues to apply the prior rules that were in effect at the time of the ALJ's decision. https://www.ssa.gov/disability/professionals/bluebook/revisions-rules.html (last visited Apr. 11, 2019).

Further, the regulations governing the evaluation of disability for disability insurance benefits and SSI are nearly identical; thus, I will generally refer to the regulations for disability insurance benefits found at 20 C.F.R. § 404.1520, *et seq.* for ease of reference.

Again, the ALJ found Donnick had the severe impairment of emphysema. Donnick primarily treated with Dr. Wilson, a pulmonologist, for her pulmonary impairments. In November 2014, Donnick presented to her treating nurse practitioner, Amy Puls, for shortness of breath and smoking cessation. (Tr. 849.) Upon physical examination, Puls noted that while Donnick's lungs had "[e]asy respiratory effort" and were "[c]lear to auscultation bilaterally without wheezes[,] rales[,] or rhonchi," "[f]orced expiration induc[ed] intense coughing which [was] unproductive." (Tr. 851.) Puls referred Donnick to pulmonary medicine for evaluation. (Tr. 852.) On January 19, 2015, Donnick treated with Dr. Wilson for the first time. (Tr. 857.) Dr. Wilson noted that Donnick experienced shortness of breath for many years and utilized Symbicort and albuterol. (*Id.*) Donnick stated that she experienced shortness of breath even while walking on level ground and that her breathing was gradually getting worse. (*Id.*) She told Dr. Wilson that she coughs and produces phlegm daily. (*Id.*) Dr. Wilson observed Donnick occasionally coughing in the office, but the cough was unproductive. (Tr. 858.) Upon physical examination, Dr. Wilson noted Donnick had mildly diminished breathing sounds bilaterally. (*Id.*) Because Donnick's current chest x-ray showed "mildly flattened diaphragms with increased restrosternal airspace," Dr. Wilson suspected Donnick had COPD and ordered complete pulmonary function testing. (Tr. 858–59.)

Donnick underwent the pulmonary function testing on January 26, 2015. (Tr. 763.) The testing showed that Donnick "[m]ost likely" had "significant chronic obstructive pulmonary disease . . . not reversible with albuterol." (*Id.*) Donnick treated with Dr. Wilson again on February 9, 2015. (Tr. 859.) Dr. Wilson noted the results of the pulmonary function testing, which showed "fairly normal lung mechanics with mild air trapping and hyperinflation however there was a rather profound severe decreased diffusion capacity." (*Id.*)

5

Dr. Wilson noted that the examination results did not correlate with having "that severe of emphysema" and he suspected Donnick suffered from pulmonary hypertension. (Tr. 860.)

On March 2, 2015, Donnick again presented to Dr. Wilson with shortness of breath. (Tr. 866.) Dr. Wilson told Donnick that he believed her shortness of breath was related to pulmonary vascular disease and recommended evaluation by a pulmonary hypertension specialist. (*Id.*) Donnick treated with physician assistant Sara Paulus at the pulmonary hypertension clinic on March 27, 2015 for continued shortness of breath. (Tr. 867–68.) Donnick reported that she could only climb about six stairs before becoming short of breath. (Tr. 868.) Paulus noted that while there was no significant desaturation with walking in the clinic, Donnick did become visibly short of breath. (Tr. 874.) Donnick treated with PA Paulus again on April 24, 2015. (Tr. 894.) Paulus noted that it was in Donnick's best interest to quit smoking because her very mild elevation in pulmonary blood pressure was likely related to developing lung disease. (Tr. 898.) Donnick was discharged from the pulmonary hypertension clinic. (*Id.*)

Donnick treated with Dr. Wilson on July 27, 2015. (Tr. 1235.) Donnick complained of progressively worsening shortness of breath. (*Id.*) Dr. Wilson again noted that pulmonary function testing showed COPD with severely reduced diffusion capacity; however, pulmonary hypertension was only a very mild problem. (*Id.*) Upon physical examination, Dr. Wilson noted moderately diminished breaths sounds bilaterally, though no wheezing, crackles, or rhonchi. (*Id.*) Donnick was also "frankly informed today that if she continues to smoke cigarettes her emphysema will become rather severe and progressive." (Tr. 1236.)

On January 25, 2016, Donnick treated with Dr. Wilson for emphysema. (Tr. 1304.) Donnick stated that her shortness of breath was worse and that she could not go outside in

6

the cold weather because of her breathing. (*Id.*) Upon physical examination, Dr. Wilson noted Donnick had moderately diminished breath sounds and wheezing during her expiratory phase. (Tr. 1305.) Dr. Wilson treated Donnick on October 24, 2016, at which time she stated that her breathing was getting worse and she was increasingly needing to use her nebulizer treatments. (Tr. 1425.) Donnick reported increased shortness of breath, fatigue with any exertion, and constant coughing throughout the day. (*Id.*) Upon physical examination, Dr. Wilson noted moderately diminished breath sounds bilaterally and wheezing and prolongation in her expiratory phase. (*Id.*)

Dr. Wilson completed a medical assessment form for Donnick on July 29, 2015. (Tr. 964–70.) Dr. Wilson opined that Donnick's prognosis was poor (Tr. 964) and that she experienced constant, daily pain (Tr. 966). Dr. Wilson opined that Donnick could sit for six hours total in an eight-hour workday; however, she would need to get up and move around hourly for five minutes before returning to sitting. (Tr. 966–67.) Dr. Wilson further opined Donnick could stand/walk for a total of one hour in an eight-hour workday and could only occasionally lift and carry five pounds. (*Id.*) He opined Donnick was incapable of even "low stress" work because stress exacerbated both her pain and her shortness of breath. (Tr. 968.)

Dr. Wilson based his opinion on the worsening pulmonary function tests showing a severely reduced diffusion capacity for oxygen and the fact that her lungs, on examination, showed moderately diminished breath sounds. (Tr. 964.) He further relied on the echocardiogram showing elevated pulmonary blood pressure. (*Id.*)

The ALJ assigned little weight to Dr. Wilson's opinion. He found that Dr. Wilson's opinion was essentially based upon Donnick's self-reports and was inconsistent with the clinical evidence. (Tr. 19–20.) The ALJ further stated, "Frankly, if Dr. Wilson's statement

7

were accepted, the claimant would not be able to sit upright for any more than five minutes. That would mean that the claimant was essentially bedridden, which the claimant's own testimony establishes is not the case." (Tr. 20.) The ALJ also cited observations made during a consultative examination of Donnick in which the examiner found her "entire presentation . . . incongruous, rather unusual, and inappropriate given the level of pain she was describing." (*Id.*) The ALJ found that these observations "cast a gloss on the opinion[ ] of Dr. Wilson," which "appear[s] to be based primarily upon the claimant's subjective self-reports." (*Id.*) In other words, because Donnick is generally not credible, to the extent Dr. Wilson's opinion relies on Donnick's self-reports, the opinion also lacks credibility.

Donnick argues the ALJ erred in assessing Dr. Wilson's opinion, primarily because the ALJ misread the opinion regarding the length of time Donnick could sit. (Pl.'s Br. at 10–11, Docket # 9.) Donnick argues that perhaps with a proper reading, he would have given Dr. Wilson's opinion more than a little weight. (*Id.*) The Commissioner does not deny that the ALJ "may have misinterpreted" Dr. Wilson's opinion regarding how long Donnick could sit at one time; however, she argues that remand is unnecessary because the ALJ gave several other reasons for discounting Dr. Wilson's opinion. (Commissioner's Br. at 7–8, Docket # 13.)

The ALJ unquestionably misread Dr. Wilson's opinion. Dr. Wilson did not opine that Donnick could only sit upright for five minutes at a time (Tr. 20); rather, he opined that Donnick could sit for six hours total in an eight-hour workday, but would need to get up and move around hourly for five minutes before returning to sitting (Tr. 966–67). Even though the ALJ misread this limitation, perhaps it does not matter. After all, the ALJ did include in the RFC an off-task limitation of no more than ten percent of the time in an eight-hour workday

8

(Tr. 18) and this seems to account for the forty minutes a day she needs to be off-task, moving around before returning to sitting.

However, while the Commissioner asserts that the "other reasons" the ALJ gave for discounting Dr. Wilson's opinion saves the decision from remand, these "other reasons" are more problematic than the misreading of Dr. Wilson's opinion regarding Donnick's sitting capacity. As the ALJ noted, Dr. Wilson's opinion, if credited, would preclude even sedentary work. (Tr. 19.) But the ALJ discounted Dr. Wilson's opinion because it was "essentially based upon [Donnick's] self-reports" and was inconsistent with the clinical evidence. (Tr. 20.) In assessing the objective medical evidence, the ALJ saw contradicting contemporary medical tests from St. Agnes hospital and St. Luke's hospital. (Tr. 19.) The ALJ contrasts the St. Agnes records, which show significant emphysema, with the St. Luke's records, which he states show only "mild obstructive disease" and a chest x-ray showing no significant abnormality. (*Id.*) From this, the ALJ concludes that while it was "possible" that Donnick's pulmonary condition was worsening, "so far, this appears to be more a matter of subjective self-reporting than clinical corroboration." (*Id.*)

This, however, is a case of the ALJ impermissibly playing doctor. *See Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings."). The ALJ reviewed the medical evidence and improperly substituted his judgment for that of Dr. Wilson. The St. Agnes records consist of the pulmonary function study conducted on January 26, 2015 that indicated significant emphysema. (Tr. 763.) In contrast, the St. Luke's records the ALJ primarily relies on are a ventilation/perfusion lung study conducted on March 17, 2015 (Tr. 835) and a chest x-ray taken the same day (Tr. 832–33.) Both tests from St. Luke's are related to Donnick's possible

9

pulmonary hypertension and were seemingly conducted to rule out pulmonary embolus. (*Id.*) The ALJ, however, took these records and independently determined that there was an inconsistency in the clinical findings regarding Donnick's pulmonary functioning.

But Dr. Wilson, a pulmonologist, relied on both hospitals' records in rendering his opinion and did corroborate a worsening of Donnick's pulmonary condition through clinical testing. (Tr. 965.) Dr. Wilson pointed to Donnick's pulmonary function tests (from St. Agnes) which showed a worsening of her condition, as well as the fact her lungs (upon physical examination) showed moderately diminished breath sounds. (Tr. 964.) He also looked at the tests for pulmonary hypertension (from St. Luke's) and noted Donnick had elevated pulmonary blood pressure. (*Id.*) This is consistent with Dr. Wilson's records, where he noted that pulmonary testing showed obstructive lung disease with a severely reduced diffusion capacity (Tr. 1235) and observed diminished breathing sounds bilaterally on multiple occasions (Tr. 858, 1235, 1305, 1425). Dr. Wilson also observed wheezing (Tr. 1305) and coughing (Tr. 858) while Donnick was in the office. Dr. Wilson's records also confirm that while the pulmonary hypertension was a problem, it was mild compared to the emphysema. (Tr. 1235–36.) Thus, Dr. Wilson appears to address the inconsistency the ALJ perceives, i.e., that the St. Luke's records (which address the pulmonary hypertension) show only mild abnormality while the St. Agnes records (which address the emphysema) show more serious abnormality.

These records are also consistent with Dr. Wilson's reported "poor" prognosis based on the fact that Donnick was "frankly informed" that if she continued to smoke cigarettes, her "emphysema will become rather severe and progressive." (Tr. 1236.) As such, while the ALJ believed that the worsening of Donnick's pulmonary condition was not clinically

10

corroborated, he was relying on his own seemingly unsubstantiated belief that the St. Agnes and St. Luke's records conflict. Dr. Wilson saw no such contradiction.

Because the ALJ incorrectly read Dr. Wilson's opinion and incorrectly discounted it based on his own interpretation of the medical evidence, the ALJ must reconsider and properly weigh Dr. Wilson's opinion on remand. Again, because Dr. Wilson's opinion, if accepted, would preclude even sedentary work, improper consideration of the opinion is not harmless error.

## CONCLUSION

The ALJ erred in his assessment of Dr. Wilson's opinion. While Donnick asks for reversal and an award of benefits, that remedy is appropriate only if all factual issues involved in the entitlement determination have been resolved and the resulting record supports but one conclusion—that the claimant qualifies for disability benefits. *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011). As discussed above, there is an unresolved issue the ALJ must sort out on remand. Thus, the Commissioner's decision is reversed and the case will be remanded for further proceedings consistent with this decision.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that the Commissioner's decision is **REVERSED**, and the case is **REMANDED** for further proceedings consistent with this decision pursuant to 42 U.S.C. § 405(g), sentence four.

**IT IS FURTHER ORDERED** that this action is **DISMISSED**. The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 23rd day of April, 2019.

                                          BY THE COURT

                                          *s/Nancy Joseph*
                                          NANCY JOSEPH
                                          United States Magistrate Judge